**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **THOMAS KARGBO**<br><br>**v.**<br><br>**PHILADELPHIA CORPORATION FOR AGING** | **CIVIL ACTION**<br><br>**NO.  13-1216** |

**Baylson, J.**                                                                                   **April 22, 2014**

## MEMORANDUM RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff brings claims under Title VII of the Civil Rights Act and the Age Employment Discrimination Act related to his termination of employment as a services coordinator at Defendant, the Philadelphia Corporation for the Aging.  Defendant has moved for summary judgment on all claims.

## I.     FACTUAL BACKGROUND

The following is a recitation of the facts in the light most favorable to Plaintiff.

Defendant provides social and health care services to senior citizens and employs 200 service coordinators who facilitate the provision of long term care services.  Plaintiff was hired on June 4, 2012 as a service coordinator for Defendant to provide social and health care benefits to senior citizens.  Plaintiff is a black male from West Africa who is fluent in four languages including Russian, and was fifty-two years old at the time of his termination.  Plaintiff was assigned to a team of six services coordinators who worked under Elise Mendelsohn, a 45-year-old white woman.  The other members of Plaintiff's team were a 36-year-old Caucasian, a 39-year-old Asian, a 57-year-old Hispanic, a 39-year-old Caucasian, and 59-year-old Caucasian.  Undisputed Fact ¶ 49.  Plaintiff was the only African American on Mendelsohn's team.  Undisputed Fact ¶ 49.

As a new hire, Plaintiff began work as a probationary employee, and completed approximately five weeks of training before working under Mendelsohn full time.  Plaintiff testified that during a staff meeting in  mid-July Mendelsohn said to him, "I don't believe you are the right man for this job.  You are 52 years old.  This job is normally for young college graduates."  Kargbo Dep. at 144:2-5.  Plaintiff testified that Mendelsohn made a similar comment to him in a private meeting after he sent an email to the wrong supervisor in August. Kargbo Dep. at 197:3-15. Plaintiff testified that he met with Mendelsohn's supervisor, Pearl Graub, twice to complain about these comments. Kargbo Dep. at 127:15-33; 128:2-7.

Plaintiff testified that Mendelsohn commented to clients on three occasions that "she does not believe a black man from West Africa, Thomas Kargbo, can speak Russian so fluently." Kargbo Dep. 135:7-9.[1]  Plaintiff also testified that Mendelsohn "told me I'm dyslexic, if I have learning disabilities." Kargbo Dep. at 170:24-171:1.  Plaintiff testified that he reported these comments to Graub in July or August that he also reported the comments to the Director of Human Resources, Raymond Polak some time in mid-July or August after he did not hear back from Graub.  Kargbo Dep. at 128:14-17 & 134:14-24.

Plaintiff testified that after he made these complaints, Mendelsohn started treating him poorly by "not giv[ing] me the attention that I need from a supervisor," and "[i]f I walk up to her to request maybe for clarification, she will slam her door before I get to her office" "[a]nd she will yell at me from across the office . . . instead of shooting me an email like she did earlier when I started, she would just yell, hey, Thomas, come here." Kargbo Dep. at 160:16-161:14. Plaintiff also testified that Mendelsohn would "not shake my hand if I reach out to her"; "she ignores me more of the time"; and "she would not allow me to come closer to her if she has to

---

[1] Mendelsohn denied making these statements to clients, but said she did compliment Plaintiff on his ability to speak Russian during the review of his three-month evaluation. Mendelsohn Dep. at 20:9-21:20.

work with us in a group. I always have to stay at the back. . . . She [would] make room for my white colleagues except me in the office . . . If we have to meet at our desk to explain to use about the new applications, she will allow my colleagues to be closer to her.  Even if I go there first, she will push me back . . . She would say, Thomas, can you step aside, please." Kargbo Dep. at 162:19-166:16.

On September 19, 2012, Mendelsohn completed Plaintiff's three-month evaluation.  Pl's Ex. I.  Plaintiff received an overall satisfactory report, but was listed as unsatisfactory in the categories of effective communication and learning orientation. Pl's Ex. I. Mendelsohn wrote in the comments section that Plaintiff struggled with "fundamental computer knowledge" and was not learning new concepts, repeating the same questions at each tutorial.  Pl's Ex. I.  Plaintiff testified that he believed Mendelsohn wrote negative comments on his three-month evaluation because he complained about her.  Kargbo Dep. at 142:17-22.  Mendelsohn recommended Plaintiff's employment be continued, and the comments outlined six improvement goals for the following month. Pl's Ex. I.

Mendelsohn subsequently documented a number of performance problems related to Plaintiff's ability to use the computer systems and to input client information correctly.  Pl's Ex. K; Def's Ex. HH (documenting Plaintiff's failure to submit required paperwork for a month after it was due).  On October 17 Mendelsohn wrote an interoffice memorandum discussing several complaints about Plaintiff's performance that she received from clients, one from a service provider, and Plaintiff's continued computer skills problems.  Def's Ex. L.  Mendelsohn concluded that Plaintiff had not met the improvement goals established in the three-month evaluation, but did not recommend discipline or termination. Def's Ex. L.

On October 24 Mendelsohn submitted a discipline form recommending termination. That day she received a call from a client's son saying Plaintiff had threatened the client after the son had called Mendelsohn with concerns about Plaintiff's performance on October 17.  Pl's Exhibit K; Def's Exhibit LL.  The form recounted the prior complaints and performance problems as well as this call from the client's son.  Pl's Ex. K.  The termination recommendation was approved by Graub, Polak, Ann Danish (Graub's supervisor), and Steve Touzell, the Director of Long Term Care.  Pl's Exhibit K.  Plaintiff was terminated on October 31, 2012.

**A. Disputed Material Facts**

1. Plaintiff's Discrimination Complaints

Plaintiff testified that he complained five times about Mendelsohn's comments and about his three-month evaluation.  Plaintiff testified he complained in mid-July 2012 to Pearl Graub about Mendelsohn's remark about his age at the staff meeting.  Kargbo Dep. at 127:15-22; 143:5-10.  Plaintiff testified that he complained to Graub in July or August about race discrimination after Mendelsohn's comment about Plaintiff's ability to speak Russian.  Kargbo Dep. at 128:2-7; 129:11-19.  Plaintiff complained a third time to the Director of Human Resources, Raymond Polak, in late July or August about the racial comments because he did not get a response from Graub.  Kargbo Dep. at 131:10-24.  Plaintiff testified he complained a fourth time to Polak after he received his three-month evaluation in September, telling Polak he believed Mendelsohn "evaluates me this way because I have complaints against her."  Kargbo Dep. at 154:2-9.  Finally, Plaintiff testified that he complained to Heloise Lobo-Gallagher who worked in Human Resources under Polak, approximately two or three weeks before he was terminated in October "to inform her that I have not had any feedback from my superiors regarding the complaint that I had made." Kargbo Dep. at 176:20-178:12.

Plaintiff also met with Lobo-Gallagher after he was terminated in November, 2012. This meeting was documented by Defendant, and Logo-Gallagher testified it was the first time she met with Plaintiff. Def.'s Ex. I. Graub and Pollack also denied that Plaintiff made any complaints before he was terminated. Graub Dep. at 54:17-55:15.

2. <u>Termination Decision</u>

There is a dispute over who was involved in the decision to terminate Plaintiff. Defendant contends Mendelsohn made no recommendation about termination, but instead Graub and Polak alone decided to recommend Plaintiff be terminated. According to Defendant, Mendelsohn brought her concerns about Plaintiff's performance to her supervisor, Graub. Then Mendelsohn and Graub met with Polak in HR, and during this meeting Graub and Polak alone decided to recommend termination. Graub reported this recommendation to her supervisor, Ann Danish, who brought it to her supervisor, Touzell, who approved the termination. Then Graub directed Mendelsohn to prepare a PCA Discipline Form terminating Plaintiff.

Plaintiff contends the evidence shows this decision was initiated by Mendelsohn, who by all accounts was in the meeting with Graub and Polak when the termination decision was made. In response to Plaintiff's interrogatories Defendant identified Mendelsohn, along with Graub, Danish, Touzell and Polak as those who participated in the termination decision. Pl's Ex. A. Plaintiff also points Polak's deposition in which he testified Mendelsohn approached him seeking to terminate Plaintiff. Finally, the PCA Discipline Form Mendelsohn completed recommended termination, suggesting that Mendelsohn did initiate the termination process.

3. <u>Replacement</u>

Defendant contends it did not hire anyone to replace Plaintiff, but instead distributed his cases among sixteen service coordinators. Defendant submitted a post-deposition affidavit

signed by Pearl Graub stating that no one person replaced Plaintiff, and that his assignments were given to sixteen different people. Def.'s Ex. K. Plaintiff points to Mendelsohn's deposition testimony that Defendant hired Patricia Kirby (age 28) to join Mendelsohn's team two months after Plaintiff was terminated. Mendelsohn Dep. at 11:2-11. Considering the evidence in the light most favorable to Plaintiff will allow a jury to find Kirby replaced Plaintiff.

## II. Procedural History

Plaintiff brings claims for age discrimination under the ADEA alleging he was terminated because of his age and/or in retaliation for his complaints about discrimination on the basis of his age. Plaintiff also brings claims under Title VII of the Civil Rights Act alleging he was terminated because of his race, he was subject to a hostile work environment because of his race, and/or he was terminated because of the complaints he made about discrimination on the basis of race. Defendant moves for summary judgment on all of Plaintiff's claims. Oral argument on the summary judgment motion was held on April 15, 2014. Defendant submitted a letter brief on April 17, 2014 responding to questions posed at oral argument. (ECF No. 36).

## III.    Analysis

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it

believes demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." <u>Id.</u> at 325. After the moving party has met its initial burden, the adverse party's response must, "by affidavits or as otherwise provided in this rule [ ] set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. <u>Anderson</u>, 477 U.S. at 255.[2]

## A. ADEA Claim

The ADEA prohibits age discrimination in employment against any person over age forty. 29 U.S.C. § 623(a)(1). "Because the prohibition against age discrimination contained in the ADEA is similar in text, tone, and purpose to that contained in Title VII, courts routinely look to law developed under Title VII to guide an inquiry under ADEA." <u>Brewer v. Quaker State Oil Ref. Corp.</u>, 72 F.3d 326, 330 (3d Cir. 1995) (reversing summary judgment for the employer). But a plaintiff must show age discrimination was the "but-for" cause of the adverse action. <u>Gross v. FBL Financial Services, Inc.</u>, 557 U.S. 167 (2009) (holding the Title VII mixed-motive theory does not apply to ADEA claims).

The burden-shifting analysis established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) is the appropriate analysis for summary judgment motions in cases alleging

---

[2] As a preliminary matter, it is undisputed Plaintiff has met exhaustion requirements by dual-filing his complaints with the EEOC and PCHR, and receiving a right to sue letter before filing his complaints in this Court.

employment discrimination.  <u>Brewer</u>, 72 F.3d at 330.  In order to establish a prima facie case of discrimination, the plaintiff must demonstrate the existence of four elements: (1) he is older than 40; (2) he applied for and was qualified for the position; (3) he suffered an adverse action; and (4) he was replaced by a sufficiently younger person to support the inference of age discrimination.  <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 727 (3d Cir.), cert. denied, 515 U.S. 1159 (1995) (reversing summary judgment for the employer).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action.  <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 254-56 (1981) (vacating reversal of judgment for the defendant after a bench trial).  The Defendant satisfies its burden of production by introducing evidence, which, if taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.  <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994) (affirming grant of summary judgment for the employer).  The defendant need not prove that the tendered reason actually motivated its behavior because the ultimate burden of proving intentional discrimination always rests with the plaintiff.  <u>Id.</u>

If the defendant is able to come forward with a legitimate, non-discriminatory reason for its action, the plaintiff can defeat a motion for summary judgment by providing evidence from which a factfinder could reasonably either (1) disbelieve the defendant's articulated legitimate reasons or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the defendant's action.  <u>Id.</u> at 764.  "If the plaintiff produces sufficient evidence of pretext, he need not produce additional evidence of discrimination beyond his prima facie case to proceed to trial."  <u>Sempier</u>, 45 F.3d at 731.

1. <u>Prima Facie Case</u>

Plaintiff produced evidence that he is older than forty, and that he applied and was qualified for the job because he was in fact hired for the job and received a satisfactory job performance review.  Pl's Exhibit I; <u>see</u> <u>Sempier</u>, 45 F.3d at 729 (finding testimony that the plaintiff's supervisor was satisfied with his performance was sufficient evidence the plaintiff was qualified for the position); <u>Brewer</u>, 72 F.3d at 330 (finding the plaintiff was qualified because he had acceptable performance ratings, even though the performance reviews contained some criticisms).  Plaintiff was terminated, which is an adverse action. Pl's Exhibit K.; <u>id.</u>

The remaining question is whether  Plaintiff was replaced by a person sufficiently younger to raise the inference of age discrimination.  The Third Circuit has held replacement by a person more than twenty years younger than the plaintiff supported the inference of age discrimination.  <u>Maxfield v. Sinclair Int'l</u>, 766 F.2d 788, 793 (3d Cir. 1985) (affirming a jury award for the plaintiff).

 Defendant contends Plaintiff cannot make this showing because his cases were reassigned to people who were not younger than him.  But Plaintiff produced evidence that Defendant hired a 28-year-old woman for his position on Mendelsohn's team two months after Plaintiff was terminated.  <u>See</u> <u>supra</u> Section I.A.3.  Plaintiff also introduced evidence that of the thirty people Defendant hired as service coordinators in the eighteen months after he was terminated, twenty-five were in their twenties and the remaining five were in their thirties at the time of hire.  Pl's Ex. B.

Defendant contends it did not hire a replacement, and instead asserts the correct comparison is to the sixteen service coordinators who were assigned Plaintiff's cases after he was terminated.  Although the Third Circuit has looked to the employees who were assigned

9

tasks after an employee was terminated, this is only when the plaintiff's position was not filled. Steward v. Sears Roebuck & Co., 231 F. App'x 201, 210 (3d Cir. 2007) (reversing judgment as a matter of law for the defendant).[3]  Since Plaintiff produced evidence he was replaced by a person twenty-four years younger than him, Plaintiff has produced sufficient evidence that he was replaced by someone young enough to support an inference of age discrimination.[4]

2. Legitimate nondiscriminatory reason

"The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes, 32 F.3d at 763.  A defendant only bears the burden of articulating a legitimate nondiscriminatory reason, but need not prove this was the actual reason for the adverse action.  Id.

Defendant asserts Plaintiff was terminated for his poor performance, specifically for his inability to learn and use computer software essential to performing the functions of his job, problems making services requests and complaints from clients and a service provider.  Def. Br. at 11.  Since Defendant has pointed to several legitimate reasons it terminated Plaintiff, it has met its burden.  See, e.g., Brewer, 72 F.3d at 330 ("Pfauser documented continuous performance problems, including poor follow-up on customer requests, poor communications with clients and with management, too little time spent in his territory, and late and ambiguous sales reports.").

---

[3] Moreover, even if we considered the comparators Defendant suggests, twelve of the sixteen were younger than Plaintiff at the time of his termination, and two thirds of the cases Plaintiff handled were transferred to younger employees. Finally, the question of whether or not Kirby replaced Plaintiff is a question of fact for the jury.
[4] Defendant contends that Plaintiff failed to show similarly situated employees were treated more favorably.  But this conflates the Title VII and ADEA analysis.  While both use the McDonnel Douglas framework, the elements of the prima facie case in ADEA cases are slightly different.  "[A]n ADEA plaintiff may establish the fourth element of the McDonnell Douglas test for a prima facie case by showing that s/he was replaced by a person sufficiently younger to permit an inference of age discrimination."  Maxfield v. Sinclair Int'l, 766 F.2d 788, 793 (3d Cir. 1985) (finding replacement by an employee more than 20 years younger was sufficient to support that inference).

3. <u>Pretext</u>

       The burden shifts back to Plaintiff to show these reasons were mere pretext, and his age is the real reason for the termination. <u>Jalil v. Avdel Corp.</u>, 873 F.2d 701, 707 (3d Cir. 1989) ("Summary judgment is inappropriate, however, if the plaintiff . . . counters the defendant's proffered explanation with evidence raising a factual issue regarding the employer's true motivation for discharge."). To survive summary judgment a plaintiff must point to some evidence that is sufficient for a reasonable fact finder to "either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Fuentes</u>, 32 F.3d at 764.

       Plaintiff points to Mendelsohn's repeated comments regarding Plaintiff's age to show a discriminatory reason for his termination. Defendant characterizes these statements as "stray remarks" that cannot support a showing of pretext. To determine whether a statement can "constitute overt evidence sufficient to show . . . a discriminatory animus towards older employees" the Third Circuit considers whether the speaker was a decisionmaker, the content of the statement and whether the statement was related to the decisional process. <u>Armbruster v. Unisys Corp.</u>, 32 F.3d 768, 779 (3d Cir. 1994); <u>see also</u> <u>Price Waterhouse</u>, 490 U.S. at 277, 109 ("[S]tatements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" do not show discriminatory intent).[5]

---

[5] Although these cases are based on a mixed-motive theory that has since been rejected in ADEA claims, <u>see</u> <u>Gross</u>, 557 U.S. at 175, the standard for showing statements demonstrate animus by the decisionmaker is the same. <u>See, e.g.</u>, <u>Ezold v. Wolf, Block, Schorr and Solis–Cohen</u>, 983 F.2d 509, 545 (3d Cir. 1992) (considering whether discriminatory statements support a showing of pretext); <u>Fuentes</u>, 32 F.3d at 767 (finding a supervisor's comment did not demonstrate animus sufficient to show pretext); <u>Waldron v. SL Indus., Inc.</u>, 56 F.3d 491, 502 (3d Cir. 1995) (finding statements showing animus combined with a prima facie case was sufficient evidence of pretext to survive summary judgment).

The Third Circuit found a statement of age-related animus by the plaintiff's direct supervisor was "evidence sufficient to allow the jury to find that the decision makers placed substantial negative reliance on the plaintiff's age in reaching their decision to fire him." Fakete v. Aetna, Inc., 308 F.3d 335, 339 (3d Cir. 2002) (internal quotations omitted) (reversing summary judgment for defendants). Several months before the plaintiff was terminated, his new supervisor told him "the new management [which included Larkin]—. . . wouldn't be favorable to me because they are looking for younger single people that will work unlimited hours and that I wouldn't be happy there in the future." Id. at 337 (quoting the plaintiff's testimony). The statement was not a mere stray remark because it was directly related to the plaintiff's job and was made by a decisionmaker a few months before he terminated the plaintiff. The statement was not mere office banter, but evidenced "his preference for 'younger' employees in a serious one-on-one conversation about Fakete's future under Larkin's watch." Id. at 339 ("[A] reasonable jury could find that Larkin's statement was a clear, direct warning to Fakete that he was too old to work for Larkin, and that he would be fired soon if he did not leave Aetna on his own initiative.").

Statements unconnected to the employment decision are not direct evidence of discriminatory intent. Armbruster v. Unisys Corp., 32 F.3d 768, 779 (3d Cir. 1994). Discriminatory statements about a plaintiff's gender five years before she was denied partnership were "too remote and isolated to show independently that unlawful discrimination, rather than Wolf's asserted reason, more likely caused the firm to deny Ezold the partnership she sought in 1988." Ezold v. Wolf, Block, Schorr and Solis–Cohen, 983 F.2d 509, 545 (3d Cir.1992) (reversing a judgment for the plaintiff after a bench trial); see also Roebuck v. Drexel Univ., 852 F.2d 715, 733 (3d Cir. 1988) (reversing summary judgment for defendants because the racial

"statements standing alone, occurring as they did over five years before the final denial of tenure, could not suffice to uphold a finding [of discrimination, although] they do add support, in combination with the other evidence, to the ultimate conclusion").  Even where the Vice President of the defendant company said that the company could not afford to keep people older than 50 making more than $50,000, he resigned three months before the plaintiffs were terminated.  Id.  Armbruster, 32 F.3d at 779 ("Thus, the district court correctly determined Markell's statement did not constitute overt evidence of discriminatory animus.").

Finally, the content of the statement is central to finding whether it shows animus in the decision-making process.  In Fuentes the Third Circuit found a supervisor's comment he had trouble pronouncing the plaintiff's Spanish name might show "insensitivity and unprofessionalism" but a reasonable factfinder could not find these statements alone "evidenc[ed] Dodd's bias against Puerto Ricans or Latinos, or to mean that Dodd invidiously discriminated against Fuentes because of his national origin."  Fuentes, 32 F.3d at 767; see also Hook v. Ernst & Young, 28 F.3d 366, 375-76 (3d Cir. 1994) (finding demeaning sexual comments were stray remarks because "there is no evidence they were related to the decision process[; t]hey were temporally remote and they had nothing to do with Hook's job performance").

The Third  Circuit reversed a grant of summary judgment because it found a supervisor's statement that he wanted the plaintiff to lose weight because "it'll make you feel better [and i]t'll make you look younger" was evidence of age-related bias.  Waldron v. SL Indus., Inc., 56 F.3d 491, 502 (3d Cir. 1995).  Although the statement was made five months before the plaintiff's termination, the speaker was the decisionmaker, and he was already considering termination at the time of the statement.  Id.  This supported a finding the statement was connected to the

decisional process.  Id.  ("A reasonable jury could conclude that this evidence of discrimination, coupled with Waldron's prima facie case, proved that age discrimination was more likely than not a determinative factor in Waber's decision to terminate Waldron's employment.").

Viewing the evidence in the light most favorable to Plaintiff, Mendelsohn's statements are not stray remarks. Plaintiff has introduced evidence showing Mendelsohn was a decisionmaker, and the statements were made a few months before Plaintiff was terminated.  The statements were not merely offensive comments, as in Fuentes, but directly commented on Plaintiff's ability to do his job.  As in Fakete, the statements were made by a decisionmaker in a serious context, at a staff meeting and in a one-on-one meeting with Plaintiff discussing his job performance.  Accordingly, a jury could find these statements were not merely stray remarks, but are direct evidence of age-related animus, supporting Plaintiff's showing of pretext.

In conclusion, Plaintiff has produced sufficient evidence to show a prima facie case of age discrimination, and has introduced evidence supporting a showing of bias in the decision making process to show pretext.  Defendant's motion for summary judgment on Plaintiff's ADEA claim is denied.

**B. Title VII claims**

To support a claim for employment discrimination under Title VII a plaintiff must establish a prima facie case showing he is a member of a protected class, applied for the position and was qualified, and suffered an adverse employment action, "under circumstances that give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class." Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410-11 (3d Cir. 1999) (affirming grant of a motion to dismiss).  Once a plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory

reason for the employment action.  Id.  Then the burden returns to the plaintiff to show that the employer's articulated reason was pretext for discrimination, and that discrimination was the real reason for the adverse action.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

1. Wrongful Termination

a. Prima Facie Case

Plaintiff has produced evidence supporting a prima facie case of race discrimination: he is a member of a protected class as an African American, he was qualified for the position because he was rated "satisfactory," he suffered an adverse employment action when he was terminated, and that he was replaced by Kirby, a white woman.  Thus, Plaintiff presents a presumption of discrimination Defendant can rebut by articulating a legitimate nondiscriminatory reason for Plaintiff's termination.

b. Legitimate Nondiscriminatory Reason

As discussed above, Defendant articulated a legitimate nondiscriminatory reason for terminating Plaintiff: his poor computer skills, failure to improve those skills, and complaints by customers and a service provider.  Pl's Exhibit K.

c. Pretext

This Court must determine if Plaintiff has introduced sufficient evidence to cast doubt that the proffered reason was the motivation for the employment decision, regardless of whether it was the correct decision. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000) (noting "an employer would be entitled to judgment . . . if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred").

"Pretext is not demonstrated by showing simply that the employer was mistaken."

Sempier, 45 F.3d at 731.  The plaintiff must point to some evidence that supports an inference

the employer did not act for the asserted reasons.  Fuentes, 32 F.3d at 765.  But the plaintiff does

not need to show "evidence directly contradicting the defendant's proffered legitimate

explanation."  Id. ("Rather, the non-moving plaintiff must demonstrate such weaknesses,

implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered

legitimate reason for its action that a reasonable factfinder could rationally find them unworthy

of credence, and hence infer that the employer did not act for the asserted non-discriminatory

reasons.") (citations and internal quotations omitted).

A plaintiff must show "not merely that the employer's proffered reason was wrong, but

that it was so plainly wrong that it cannot have been the employer's real reason." Keller v. Orix

Credit Alliance, 130 F.3d 1101, 1109 (3d Cir.1997) (affirming summary judgment for the

employer).  "What is at issue is the perception of the decision maker, not the plaintiff's view of

his own performance."  Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991) (citations

omitted) (affirming directed verdict for the employer).  A plaintiff can survive summary

judgment by showing the "defendant's explanation is unworthy of credence."  Reeves, 530 U.S.

at 147 (reversing the appellate court's reversal of a denied motion for judgment notwithstanding

the verdict).

The defendant in Jalil asserted that the plaintiff was fired for refusing to remove his

headphones during work and for insubordination.  Jalil, 873 F.2d at 703 (affirming summary

judgment on plaintiff's national origin discrimination claim).  The plaintiff produced evidence

that two other employees were cited for insubordination but were not terminated, and that other

employees wore headphones but were not disciplined.  Id. at 708.  The Third Circuit held the

plaintiff did not present sufficient evidence to show the defendant's reasons were pretextual, because the plaintiff did not present any evidence that showed the two other insubordinate employees were similarly situated to plaintiff, or even that they were outside of the protected class.  Id.  In addition, the plaintiff's "vague testimony" that other employees wore headphones was "too general" to question the validity of the defendant's proffered reason.  Id.

The plaintiff in Brewer showed the numerous performance problems the defendant cited as its reason for termination were documented throughout the plaintiff's 23-year employment history.  72 F.3d at 333.  This cast doubt on the employer's articulated non-discriminatory reason for the termination based on infractions the company had long overlooked or tolerated.  Id.  In addition, the plaintiff was awarded a bonus for exceeding sales quotas three months before he was terminated. Id.  The Third Circuit found it significant that the defendant stated sales performance was the most important measures of the plaintiff's job, and the plaintiff was the only salesman who was awarded that bonus.  Id.

 Although the plaintiff in Brewer also had documented performance problems, they were accepted for twenty-three years, so it created an inference of pretext that the same problems suddenly resulted in the plaintiff's termination.  Moreover, the Third Circuit noted that the plaintiff in Brewer had outstanding sales performance three months before he was fired, raising the inference of pretext.  Plaintiff has not presented any evidence showing his performance criticisms were unusual or fabricated, and Defendant has provided documentation of a large number of errors and client complaints.

Plaintiff disputes the validity of a number of the performance problems cited by Defendant as the reason for Plaintiff's termination. Plaintiff produced evidence that due to Defendant's change in billing practices, many service coordinators had problems using the

17

computer system and had errors.  Pl's Exhibits E, G, F, & J.  This is similar to the vague

comparator testimony in Jalil: Plaintiff has not pointed to any individual who had the volume or

nature of similar performance problems.  As in Jalil Plaintiff has also not presented any evidence

showing these comparators were similarly situated to Plaintiff as a probationary hire with both

computer problems and client complaints.

Plaintiff contends that clients often complain about services coordinators, but the other

employees were not terminated as a result.  Plaintiff cites to Mendelsohn's testimony that she

gets complaints from clients or their family members "from time to time." Mendelsohn Dep. at

39:11-23 (but "[i]t doesn't happen that often").  Touzell testified that "[t]here have been other

complains from consumers" but he did not recall whether any employees were terminated as a

result.  Touzell Dep. at 23:20-24:6.

This evidence is even weaker than the evidence that was "too general" to show others

were not terminated for wearing headphones in Jalil because there is no evidence about the

content of the complaints, and there is no evidence that these complaints did not lead to

discipline or termination.  As in Jalil, Plaintiff has not produced any evidence showing similar

complaints were made about other service coordinators, and there is no evidence about the race

or the probationary status of those service coordinators who were the subject of complaints but

were not terminated. [6]

---

[6] Graub testified that "[m]ost complaints have to do with service approval, participant or family wants more care, and it is possible the service coordinator doesn't feel it is justified."  Graub Dep. at 49:12-16. Mendelsohn testified that provider coordinators might call to correct a service order, but "I've never received a call like that from a provider coordinator before."  Mendelsohn Dep. at 45:11-13.

Plaintiff has not produced any evidence  that customers complained that a service coordinator did not understand what was needed, failed to respond to phone calls, or was repeatedly unable to answer client and service provider questions without speaking to a supervisor.  There is no evidence a client complained that another service coordinator threatened him.  Although Plaintiff disputes that this threat occurred, the question is not whether Plaintiff did in fact threaten the client, but rather, whether Plaintiff has introduced evidence to cast doubt that the complaints and performance problems were the reasons for Plaintiff's termination.

To support a showing of racial animus, Plaintiff points to Mendelsohn's comments that she was surprised a black man from West Africa could speak such good Russian, and questioning whether Plaintiff was dyslexic.  As discussed in Plaintiff's ADEA claim, statements evidencing animus by a decision maker can support a showing for pretext, but such comments must be related to the employment decision.  Statements divorced from the employment decision are properly characterized as "stray remarks."  See Hook v. Ernst & Young, 28 F.3d 366, 375 (3d Cir. 1994) (finding statements by a decisionmaker were nonetheless stray remarks because ([t]hey were temporally remote and they had nothing to do with Hook's job performance").  Unlike Mendelsohn's statements about Plaintiff's age, there is no evidence connecting these statements to the decisional process.  Rather, they are akin to the insensitive remarks in Fuentes that can be considered as part of the evidence of pretext, but alone are insufficient to show racial animus.  Fuentes, 32 F.3d at 767.

Although stray remarks alone are insufficient, they can support a finding of pretext when there is additional evidence to disbelieve the employer's proffered reason.  In Waldron the Third Circuit rejected a district court's finding a stray remark was irrelevant because the comment was made by a person involved in the termination decision.  Waldron, 56 F.3d at 502.  "Thus, we believe that the comment may be entitled to some weight when considered by the jury, although standing on its own it would likely be insufficient to demonstrate age-related animus."  Id.  But, the plaintiff in Waldron produced other evidence of pretext by showing the defendant's proffered reason for termination—corporate restructuring—never occurred, indicating the reason was pretext for discrimination.  Id. at 501.

Here, Plaintiff has failed to produce any evidence that could cause a reasonable fact finder to disbelieve Defendant's proffered reason for termination.  Although Plaintiff has

produced evidence of race-related remarks by a decision-maker, there is no evidence connecting these statements to the employment decision, so a jury could not find pretext based on these statements alone.  Unlike <u>Waldron</u> there is no additional evidence questioning the veracity of Defendant's articulated reasons for termination.  Accordingly, Defendant's motion for summary judgment will be granted on Plaintiff's Title VII claim for wrongful termination.

2. <u>Hostile Work Environment</u>

To establish a hostile work environment claim, a plaintiff must show "(1) [he] suffered intentional discrimination because of his [protected class], (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of respondeat superior liability." <u>Mandel v. M & Q Packaging Corp.</u>, 706 F.3d 157, 167 (3d Cir. 2013) (reversing the grant of summary judgment on a hostile work environment claim).

The conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21 (1993) (reversing dismissal). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998) (reversing the vacation of a judgment for the plaintiff following a bench trial).

In determining the existence of a hostile work environment, the totality of the circumstances must be examined. <u>Cardenas v. Massey</u>, 269 F.3d 251, 260 (3d Cir. 2001) (reversing summary judgment on a hostile work environment claim).  Circumstances include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23 (holding a court need not find the harassment "to be psychologically injurious" "[s]o long as the environment would reasonably be perceived, and is perceived, as hostile or abusive"). Respondeat superior liability exists where "management-level employees had actual or constructive knowledge" about the harassment "and failed to take prompt and adequate action." Andrews v. City of Philadelphia, 895 F.2d 1469, 1486 (3d Cir. 1990) (affirming judgment n.o.v. for the employer).

In Shramban v. Aetna, the plaintiff's supervisor "asked her if she 'knew what people said about blondes'" and said "'there is only one way to tell a natural blonde'" in addition to making inappropriate contact with her while exchanging paperwork, and "made comments about her personal life, clothes, jewelry and appearance." 115 F. App'x 578, 579 (3d Cir. 2004) (affirming summary judgment for the defendant). This conduct was neither severe nor pervasive enough to alter the terms and conditions of employment. Id. at 580 (explaining the standard is an objective one, and a reasonable person in the plaintiff's position would not be detrimentally affected, even if the plaintiff herself may have been).

There was sufficient evidence of severe and pervasive harassment to survive summary judgment in Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1082 (3d Cir. 1996). In Aman evidence showed managers made several derogatory statements about black employees, including the district controller's statement "we're going to have to come up there and get rid of all of you;" the general manager's statement he "knew all about her and the other two other [African American] employees;" and the general manager's statement at a district-wide meeting that "the blacks are against the whites." Id. The Third Circuit concluded a reasonable jury could infer from the statements and attendant circumstances "a clear tone of racial motivations and

implications." Id. at 1083 ("There are no talismanic expressions which must be invoked as a condition-precedent to the application of laws designed to protect against discrimination. The words themselves are only relevant for what they reveal—the intent of the speaker."). In addition to these comments, the plaintiffs testified to numerous other examples of harassment, including one plaintiff who had her time card stolen, was falsely accused of wrongdoing, her supervisors yelled at her "on a daily basis," and that other employees including a manager ignored her or refused to deal with her. Id. These incidents "viewed in isolation, arguably may not have been motivated by racial animus," but "[i]n light of the suspicious remarks discussed above, a reasonable jury could interpret this behavior as part of a complex tapestry of discrimination." Id. at 1083.

Plaintiff testified that Mendelsohn said "she don't believe a [black] man from West Africa, Thomas Kargbo, can speak Russian so fluently" to clients on three separate occasions. Kargo Dep. at 123:4-24. Plaintiff also testified that Mendelsohn "told me I'm dyslexic, if I have learning disabilities." Kargbo Dep. at 170:24-171:1. Plaintiff understood this as a reference to his race. Kargbo Dep. at 171:5.[7] Finally, Plaintiff testified that Mendelsohn refused to shake his hand, ignored him, slammed her door when he approached her office, made him stand away from her when the team met at someone's desk, and yelled across the office for him. Plaintiff was the only African American on Mendelsohn's team. Undisputed Fact ¶ 49. Plaintiff testified that the other team members were not subject to this mistreatment.

As the Third Circuit explained in Aman, coded comments can be found to refer to race in a manner that supports a hostile work environment claim. Aman, 85 F.3d at 1082. Moreover, all of the conduct must be considered as a whole, not merely as isolated instances. Id. The alleged

---

[7] When asked, "Why do you believe that comment was made because of your race?" Plaintiff responded, "Because I do speak English like everybody else, maybe with an accent, but she will not tell me that she don't understand what I'm saying." Kargbo Dep. at 171:5.

harassment was more severe than the comments about blondes and the plaintiff's personal life in

<u>Shramban</u>.  Here the racial statements were coupled with aggressive conduct including yelling,

slamming doors, and refusing to shake the Plaintiff's hand.  Significantly, Plaintiff testified that

Mendelsohn's conduct impacted his work by pushing him to the back of the office when

explaining a new application to the group, and "not giv[ing] me the attention that I need from a

supervisor."  Kargbo Dep. at 160:16-161:14.  Plaintiff testified that Mendelsohn would cancel

"my supervision with her at the last minute," that "she discontinued my mentor," "[a]nd she

would not give me the same attention as she did to all her teammates."  Kargbo Dep. at 160:16-

161:5.  Plaintiff also testified that Mendelsohn did not treat the other non-black employees this

way, stating that she did shake their hands, gave them appropriate supervision, and she would tell

him to step aside to "make room for my white colleagues." Kargbo Dep. at 161:1-166:16.

Although the evidence does not show how pervasive this conduct was, the potential

impact of the harassment on Plaintiff's training and supervision could allow a jury to find this

conduct was sufficiently severe to alter the terms and conditions of his employment.  Plaintiff

has also produced evidence connecting this harassment to his race, through Mendelsohn's

comments and his testimony that none of his white colleagues were subject to this conduct.

Finally, the alleged conduct was by a supervisor, demonstrating respondeat superior liability.

Accordingly, Defendant's motion to dismiss Plaintiff's Title VII claim for a hostile work

environment will be denied.

**C. Retaliation**

Plaintiff brings claims for retaliation under the ADEA and Title VII, alleging he was terminated because he complained about discriminatory conduct.

Title VII prohibits retaliation against an employee because he or she engaged in a protected activity.  42 U.S.C. § 2000e–3(a).  The analysis to show a retaliation claim is identical for ADEA and Title VII claims.  Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002) (reversing summary judgment for the employer).  To establish a prima facie case of retaliation a plaintiff must show  "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."  Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997) (affirming summary judgment for the defendant).  Then the burden of production shifts to the defendant to show a legitimate nonretaliatory reason for the adverse action.  Id.  The plaintiff must then show "both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."  Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006) (quoting Krouse, 125 F.3d at 500-01) (reversing summary judgment for the defendant).  "To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions."  Fuentes, 32 F.3d at 764.

1. Prima facie case

a. Protected Activity

"A protected activity can be either participation in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')."  Moore, 461 F.3d at 341.  Protected participation is when the plaintiff has

24

"made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 269 (2001) (quoting 42 U.S.C. § 2000e-3(a)) (reversing summary judgment for the defendant).  Protected opposition is conduct opposing any practice in violation of Title VII or the ADEA such as a complaint to a supervisor or manager.  Moore, 461 F.3d at 353.  A plaintiff does not need to show the conduct complained of was in fact discriminatory, but the plaintiff must show he had "a good faith, reasonable belief that a violation existed."  Aman, 85 F.3d at 1085.

The plaintiff in Breeden did not have such a reasonable belief when she complained about a meeting reviewing job applicants. Breeden, 532 U.S. at 271.  Her supervisor read aloud an excerpt of a report on one applicant that said the applicant once stated to a co-worker "'I hear making love to you is like making love to the Grand Canyon,' [and] looked at respondent and stated, 'I don't know what that means.'" Id. ("The other employee then said, 'Well, I'll tell you later,' and both men chuckled.").  The Supreme Court held that "[n]o reasonable person could have believed that the single incident recounted above violated Title VII's standard" because it was "at worst an 'isolated inciden[t]' that cannot remotely be considered 'extremely serious,' as our cases require."  Breeden, 532 U.S. at 271.

A single incident of sexual harassment was sufficient to support a claim for retaliation in Jensen v. Potter, 435 F.3d 444, 446 (3d Cir. 2006) (reversing summary judgment for the employer).  Jensen's supervisor said to her, "I want to make love to you all day long," and when she declined he asked her to join him for breakfast, and when she again said no, he responded: "Anna, you put me in a compromising position."  Id.  The Third Circuit reversed the district court's grant of summary judgment for the defendant, holding a retaliation claim can be based on a complaint about a hostile work environment.  Id. at 448.

25

Plaintiff testified that he complained to Mendelsohn's supervisor and the director of human resources five times. Kargbo Dep. at 127:15-33; 128:2-17; 129:20-19; 134:14-14; 139:3-6; & 173:1-23. These informal verbal complaints can be protected opposition if Plaintiff had a reasonable, good faith belief the conduct complained of violated Title VII or the ADEA. Zelinski v. Pennsylvania State Police, 108 F. App'x 700, 705 (3d Cir. 2004) (finding a complaint to a supervisor that specifically refers to age discrimination is a protected activity). Defendant challenges that a reasonable person would not believe Mendelsohn's comments violated the ADEA or Title VII.

i. Age Complaints

Mendelsohn's comments about Plaintiff's age are more serious than the single off-color remark in Breeden because they were explicitly directed at Plaintiff and referred to his ability to do his job. Although not quite as severe as the unwanted sexual advances in Jensen, a reasonable trier of fact could find it was reasonable to believe these two statements violated the ADEA because they specifically mentioned Plaintiff's age, that he was too old, and that he could not do the job because of his age. Accordingly, Plaintiff's complaints about his age were a protected activity.

ii. Race Complaints

Mendelshon's comments about Plaintiff's race were also more significant than the isolated incident Breeden because they were about Plainitff's race, and were repeated several times. As the Third Circuit made clear in Jensen, a protected activity can be a complaint about a hostile work environment, and the underlying conduct itself does not need to be actionable. Although the comments alone cannot support a showing of discriminatory intent to terminate Plaintiff, it was not unreasonable to believe that a supervisor should not be commenting on an

employee's race to clients in the workplace. Accordingly, there is sufficient evidence to show

Plaintiff had a reasonable, good faith belief that Mendelsohn's comments amounted to a hostile

work environment, and these complaints were also a protected activity.

b. Adverse Action

       An adverse action is any conduct that is "materially adverse" and would have "dissuaded

a reasonable worker from making or supporting a charge of discrimination." Burlington N. &

Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

       Plaintiff testified to abusive conduct following his complaints, and was terminated.

Although Defendant disputes the facts regarding Mendelsohn's conduct toward Plaintiff, it is

undisputed that Plaintiff was terminated, which is an adverse action.

c. Causal Connection

       Defendant contends Plaintiff has not produced any evidence of causation.  A plaintiff can

show causation by showing "(1) an unusually suggestive temporal proximity between the

protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with

timing to establish a causal link" or (3) "from the 'evidence gleaned from the record as a whole'

the trier of the fact should infer causation." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d

259, 267 (3d Cir. 2007) (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir.

2000)).

       "The cases that accept mere temporal proximity between an employer's knowledge of

protected activity and an adverse employment action as sufficient evidence of causality to

establish a prima facie case uniformly hold that the temporal proximity must be 'very close'"

Breeden, 532 U.S. at 273.  Temporal proximity was unusually suggestive in Fasold where the

employee's Level II grievance was denied less than three months after he filed charges with the

EEOC.  Fasold v. Justice, 409 F.3d 178, 190 (3d Cir. 2005) (reversing summary judgment on the retaliation claims, and noting that the district attorney presiding over the grievance hearing questioned the plaintiff about his EEOC complaint and specifically mentioned it in the letter denying the grievance).  Courts more commonly find temporal proximity, without more, is unusually suggestive when the adverse action follows the protected activity by a few days, Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (reversing grant of summary judgment when the plaintiff was terminated two days after the protected activity) or a few weeks Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 188 (3d Cir. 2003) (ten days).

Unusual temporal proximity was not found in Woodson v. Scott Paper, 109 F.3d 913, 921 (3d Cir. 1997) (upholding a jury verdict for the plaintiff) where two years elapsed between the complaint and the plaintiff's termination, nor in Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (affirming a grant of summary judgment for the defendant) where nineteen months was too long of a period of time.  Even shorter time periods were not unusually suggestive in Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004) (affirming summary judgment when more than two months elapsed), and LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007) (affirming summary judgment because three months was not sufficiently proximate to be unusually suggestive).

Where there was no temporal proximity, ongoing antagonism supported a showing of causation in an unpublished Third Circuit opinion where the court vacated a grant of summary judgment for the defendant.  Zelinski, 108 F. App'x at 707.  The plaintiff presented evidence of four instances of antagonism following her report of sexual harassment in the fall of 1999, leading up to her transfer to a patrol unit in August 2000.  Id. at 706-07 ("Zelinski alleges she was subjected to false criticism for the execution of a search warrant in January 2000, in front of

other troopers; she was unfairly criticized for misconduct in April 2000; and Altieri placed a disciplinary note in her file.  Finally, Zelinski maintains that she had to undergo two separate sessions of unwarranted disciplinary counseling in July of 2000.").  The plaintiff also showed her supervisor gave inconsistent reasons for her transfer, and a number of those reasons related to the plaintiff's attitude and demeanor.  Id. at 707.  Although this last factor merged with the plaintiff's showing of pretext, "[i]f it is determined that these reasons are merely pretextual, then they can be considered inconsistent reasons for the adverse employment action, ultimately leading to a conclusion of causation."  Id.

Plaintiff testified that he made five complaints about Mendelsohn, from July through October 2012, up to two or three weeks before he was terminated on October 31, 2012.  This timeframe is between the short periods of a few days that consistently support unusually suggestive temporal proximity, and the several months or years, which do not.  But, Plaintiff has also testified to a pattern of antagonism following his complaints.  Plaintiff testified that Mendelsohn began treating him poorly after he complained, and testified that the reason Mendelsohn wrote negative comments in his three-month evaluation was because he made complaints.  Kargbo Dep. at 142:17-22.  Plaintiff also testified that Mendelsohn continued to send him unnecessary emails with instructions for processes he had already mastered to "make me look incompetent."  Kargbo Dep. at 205:2-208:14.

Similar evidence was sufficient to survive summary judgment in Zelinski where the plaintiff testified that a number of her performance criticisms were fabricated or overblown in retaliation for her complaints of sexual harassment.  108 F. App'x at 707.  A jury could find that Mendelsohn's documentation of performance problems and client complaints, the escalation of that documentation in the two weeks before his termination, and Mendelsohn's conduct towards

Plaintiff after his protected activity shows a causal connection between the complaints and Plaintiff's termination.

2. Legitimate Nondiscriminatory Reason and Pretext

Defendant points to Plaintiff's performance problems as the legitimate nondiscriminatory reason for his termination.  Plaintiff contends the performance problems were pretext for retaliation for his complaints, and points to several pieces of evidence suggesting pretext.  First, Mendelsohn testified that she did not note any of Plaintiffs' computer performance problems until early August, shortly after Plaintiff filed several complaints in mid-July and early August. Mendelsohn Dep. at 22:12017.  Second, Plaintiff testified Mendelsohn gave him a poor evaluation because he complained about her comments.  Third, Plaintiff testified that many of Mendelsohn's emails to Plaintiff with instructions on using the various computer programs were not to help him but were to make him look incompetent.  A reasonable trier of fact could find that these emails were sent to create a paper trail of nonexistent performance problems.

There are several facts suggesting the performance issues Mendelsohn documented were not fabricated,[8] but Plaintiff has produced sufficient evidence to raise genuine questions of fact.

### IV.   CONCLUSION

This Court will deny Defendant's motion for summary judgment on Plaintiff's ADEA claims and Title VII claims of hostile work environment and retaliation.  Defendant's motion to summary judgment on Plaintiff's Title VII claim for wrongful termination will be granted.

O:\Julie\Kargbo v. Phila Corp. Aging, No. 13-1216\Kargbo MSJ Opinion.docx

---

[8] For example, in both the three-month evaluations and the inter-office memorandum documenting customer and provider complaints and continued computer problems, Mendelsohn laid out a six-month plan for improvement, indicating Mendelsohn did not intend to recommend termination at the end of October. Pl.'s Ex. K.  In addition, Mendelsohn did not recommend termination until after the client's son reported Plaintiff made a threatening call to him.  Plaintiff also testified that when Mendelsohn gave him the evaluation she told him "it's just an evaluation that she has to do . . . she knows I will improve and then everything will be okay."  This testimony that Mendelsohn reassured Plaintiff that she had confidence in him also undermines Plaintiff's theory that the  negative comments in the evaluation were attributable to retaliation.  But this analysis requires a balancing of the evidence that is inappropriate at the summary judgment stage.